**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE ACTION PERFORMANCE COMPANIES INC. SECURITIES LITIGATION | No. 05-2512-PHX-DGC<br><br>**ORDER** |

Defendant Motorsports Authentics, Inc., formerly Action Performance Companies, Inc. ("Action"), and Fred W. Wagenhals (collectively "Defendants") have moved to dismiss Plaintiff's Amended Class Action Complaint. Dkt. #65. The Court has reviewed the memoranda submitted by the parties. Dkt. ##65, 68, 69. For the reasons stated below, the Court will grant Defendants' motion.[1]

**I.    Background.**

Action is a public company involved in the design and marketing of licensed Nascar memorabilia, including apparel and die cast replicas of vehicles. Dkt. #65 at 7. In 2003, Action reported lower fourth quarter ("4Q03") earnings than expected, triggering a decline in the price of its shares. Dkt. #64 at ¶ 110. Action had predicted 4Q03 revenues from $100

---

[1] The Court will deny Defendants' request for oral argument because the parties have submitted thorough memoranda and the Court concludes that oral argument will not aid its decisional process. *See Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991), *cert denied*, 503 U.S. 920 (1992).

million to $115 million, or $0.52 to $0.65 per share. *Id*. at ¶ 99. On October 23, 2003, Action issued a press release stating that 4Q03 earnings would not meet expectations and explaining many of the factors that impacted earnings. *Id*. at ¶ 107. The price of Action shares fell the following day from $26.32 per share to $20.25 per share. *Id*. at ¶ 108. On November 5, 2003, Action reported its final 4Q03 results. *Id*. at ¶ 110. Earnings per share were $0.15, well below the company's predictions. *Id*. Action's shares fell further, closing at $17.88 per share on November 6, 2003. *Id*. at ¶ 111. Action attributed its weak financial performance to several factors, including the change in Nascar's primary sponsor from Winston to Nextel, inventory liquidation caused by driver changes during the 2003 Nextel Cup season, and increased freight cost. *Id*. at ¶ 107.

Plaintiff Cornelia I. Crowell GST Trust seeks to represent a class of individuals who acquired Action securities during a Class Period from June 2, 2003 to April 20, 2004. Dkt. #64 at ¶¶ 11, 15-20.[2] Plaintiff alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 through false representations and material omissions. *Id*. at ¶¶ 114-120. The Amended Complaint ("Complaint") also alleges that Fred Wagenhals, the chief executive officer and president of Action, violated Section 20(a) of the Exchange Act by causing Action to disseminate false and misleading information. *Id*. at ¶¶ 121-25.

Plaintiff contends that Defendants made forecasts regarding Action's 4Q03 performance that they knew were false or misleading, and failed to notify investors that certain factors would decrease earnings for the quarter. These factors include Action using air shipping rather than freight shipping to meet deadlines for several races, and Action experiencing inventory obsolescence due to the sponsorship change and early season driver terminations. *Id*. at ¶¶ 3-4. Although Defendants knew that these increased costs would

---

[2]The Court is uncertain why Plaintiff extends the class period to April 20, 2004. According to the Complaint, Action disclosed its 4Q03 results on November 5, 2003. Dkt. #64 at ¶ 110. This issue does not, however, affect the current motion.

- 2 -

diminish earnings during 4Q03, Plaintiff alleges, they failed to notify investors of Action's troubles. *Id*. at ¶ 5. Plaintiff alleges that Defendants' motive was to use the inflated stock price to acquire Funline Merchandise Co. in September of 2003. *Id*.

**II.     Pleading Requirements in Securities Fraud Actions.**

Defendants bring their motion under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In ruling on a motion to dismiss, the Court must accept the plaintiff's allegations as true and construe them in the light most favorable to plaintiff. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002).

To establish a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead and prove (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). The pleading must conform to the "particularity" requirements of Rule 9(b). *See Gompper*, 411 F.3d at 1014; *Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985).

The PSLRA enhanced the pleading requirements in private securities fraud litigation. A complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also, "with respect to each act or omission[,] . . . state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind," or scienter. 15 U.S.C. § 78u-4(b)(2). To plead scienter properly, "[t]he complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with actual knowledge that the statement was false or misleading." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085

- 3 -

1  (9th Cir. 2002) (internal quotations omitted).[3] "The stricter standard for pleading scienter
2  naturally results in a stricter standard for pleading falsity, because falsity and scienter in
3  private securities fraud cases are generally strongly inferred from the same set of facts, and
4  the two requirements may be combined into a unitary inquiry under the PSLRA." *Gompper*,
5  411 F.3d at 1015 (internal quotation marks and citations omitted). Upon motion from any
6  defendant, a court must dismiss any complaint that does not satisfy these requirements. 15
7  U.S.C. § 78u-4(b)(3)(A). Congress enacted the PSLRA to put an end to the practice of
8  pleading "fraud by hindsight." *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1021 (9th Cir.
9  2005).

10 **III.   Analysis.**

11       **A.   Falsity and Scienter.**

12       The PSLRA requires a complaint to "specify each statement alleged to have been
13 misleading[.]" 15 U.S.C. § 78u-4(b)(1). Given this requirement, the Court will not consider
14 allegedly false or misleading statements not specified in the Complaint, but discussed in
15 Plaintiff's brief, such as Wagenhals' statements from the July 23, 2003 conference call that
16 Nascar's sponsorship change was "very good news for Action" and presented "wonderful
17 opportunities for the sport and for Action Performance," or Action CFO David Martin's
18 statement that "there has not been a change fundamentally in any of the business lines." Dkt.
19 #68 at 6.

20       The Complaint includes four pages of block quotes, but it specifically identifies only
21 three omissions that allegedly rendered four statements false or misleading. Dkt. #64 at

---

[3] Defendants argue that their statements were forward-looking, requiring Plaintiff to plead "actual knowledge" to satisfy the scienter requirement. *See* 15 U.S.C. § 78u-5(c)(1). Because the Court finds that Plaintiff has failed to plead that Defendants acted with even the lower standard of intent or deliberate recklessness, the Court will decline to address whether Defendants' statements are protected by the safe-harbor provision for forward-looking statements. *See Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. The Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004).

- 4 -

¶ 101. These omissions and misrepresentations will be the focus of the Court's analysis. The Court will address each alleged omission and misrepresentation "to determine whether singly or together they were both misleading and material." *McCormick v. Fund American Companies, Inc.*, 26 F.3d 869, 878 (9th Cir. 1994).

### 1. Three Alleged Omissions.

Plaintiff asserts that the 4Q03 forecasts were rendered false or misleading by Defendants' failure to disclose (a) Action's accumulation of obsolete inventory due to the sponsorship change or driver changes, (b) delays in receiving design information, which could lead to delays in filling orders for track-side sales, and (c) increases in shipping costs necessary to avoid the delays. Dkt. #64 at ¶ 101.

Rule 10b-5(b) makes it illegal "[t]o make any untrue statement of a material fact *or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading*[.]" (emphasis added). "To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Before addressing whether an omission is material, however, the Court must first analyze whether the Complaint states with particularity the facts on which Plaintiff bases its belief that the alleged omission is true. *See* 15 U.S.C. § 78u-4(b)(1); *McCormick*, 26 F.3d at 878 (reviewing the district court's grant of summary judgment by examining whether facts existed that could prove the truth of the alleged omissions).

### a. Obsolete Inventory.

Plaintiff alleges that Defendant failed to disclose that its earnings would be adversely affected by inventory rendered obsolete by the sponsorship and driver changes during the period. The Complaint, however, fails to provide specific facts showing what problems of inventory obsolescence existed during 4Q03 and which of these problems became known to Defendants before the 4Q03 forecasts. Specifically, although the Complaint list various

problems related to inventory, it is largely devoid of dates on which these problems arose or became known to Action.

The Court has found only 6 paragraphs in the Complaint that even vaguely refer to a date before the 4Q03 forecast. Dkt. #64 at ¶¶ 41, 55, 60, 66, 67, 72. These paragraphs relate to three events: the Nextel sponsorship change in June of 2003, the departure of driver Steve Park in May of 2003, and a change in UPS sponsorship in the "spring of 2003." The Complaint does not allege specific facts showing why these events resulted in an adverse effect during 4Q03, or, more importantly, why Defendants knew or should have known before the projections that the events would have such an effect. Furthermore, these paragraphs pertain only to the alleged omission regarding obsolete inventory; there are no dates in the Complaint supporting other alleged misrepresentations and omissions. Without the dates that problems became known, the Complaint does not "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind" – that Defendants either intentionally or with deliberate recklessness concealed facts they knew would adversely affect Action's 4Q03 performance. 15 U.S.C. § 78u-4(b)(2).

While the Complaint states that the Nextel sponsorship change was announced in June of 2003, the Complaint does not with particularity allege facts showing that problems associated with the sponsorship change were known to Defendants when they made their forecasts. For example, the Complaint states "much of Action Performance's already produced but unsold product inventory was rendered worthless" by the sponsorship change. Dkt. #64 at ¶¶ 41, 55. There are no details about why this occurred (given the apparent fact that the change was not to take effect until the next year), which products were rendered worthless, what qualifies as "much" inventory, or when the obsolescence became known to Defendants.

The Complaint's allegations regarding the termination of driver Steve Park are similarly conclusory. There are no facts showing the extent of this change on inventory levels, and Plaintiff never provides the names of other "discontinued drivers" it alleges

affected the inventory. Dkt. #64 at ¶ 66. In fact, Defendants disclosed inventory problems caused by driver changes in its July 23, 2003 conference call, in which it stated that "two drivers this year . . . got fired and we had to liquidate a lot of inventory[.]" Dkt. #65, Ex. D at 12. The Complaint does not allege that this statement referred to drivers other than Park. If it referred to Park, there appears to have been no omission.

Plaintiff alleges that a change in the UPS logo in the Spring of 2003 rendered $1 million worth of inventory obsolete, but does not mention the type of inventory and whether the obsolescence included die cast cars and other products sold track-side. *Id*. at ¶ 72. Moreover, the Complaint does not allege facts showing why the inventory was rendered obsolete or when and why this fact would have been known to management. Furthermore, this information comes from CW3, who worked in the Charlotte office, which was not involved in the die cast collectible production that forms the bulk of Plaintiff's Complaint.[4]

Allegations that Wagenhals was a "hands on" manager who "kept his pulse on everything" or that Action held regular meetings does not, without more detail regarding the dates and contents of those meetings, establish a strong inference that Defendants acted with the required state of mind in failing to disclose inventory information. *See In re Vantive Corp.*, 283 F.3d 1079, 1087 (9th Cir. 2002) (rejecting plaintiff's attempt to establish knowledge by referring to defendants' "'hands on' management style, their 'interaction with other corporate officers and employees, their attendance at management and board meetings, and reports generated on a weekly and monthly basis in the Finance Department'").

Finally, Plaintiff argues that "it is reasonable to infer that defendants were aware of the impact of the Nascar sponsorship change and the large number of driver changes." Dkt.

---

[4]Plaintiff's other facts are similarly insufficient to show the truth of the omission concerning inventory. Plaintiff alleges that "by 2003" there was a build-up of "unsold inventory," but does not state with particularity when this build-up occurred. Dkt. #64 at ¶ 71. Additionally, Plaintiff alleges that CW2 was instructed not to count certain inventory during 2003, but fails to allege that such a count took place before Defendants made the 4Q03 forecasts.

- 7 -

1  #68 at 13. But a reasonable inference of scienter is not enough under the PSLRA. The
2  statute requires facts that establish a "strong inference."   15 U.S.C. § 78u-4(b)(2).

### b. Delays in Filling Orders.

Plaintiff devotes much of the Complaint to alleging that delays in receiving design confirmation from Nascar and various sponsors led to delays in filling special orders in time for track-side sales during 4Q03. As noted, however, the Complaint does not allege facts showing why Action would have experienced such delays in 4Q03 given that the sponsorship change did not take effect until 2004. In fact, Plaintiff does not allege with any specificity that Action was unable to fill orders during 4Q03.

The Complaint alleges that much of the delay arose not from the June 2003 announcement of the sponsorship change, but from subsequent difficulties in communicating with Nextel. But the Complaint provides no allegations concerning when these subsequent difficulties arose and whether they were known to Defendants before the 4Q03 projections.

The Complaint lists specific examples of certain sponsors or drivers from whom Action generally had difficulty obtaining design changes with sufficient lead time to order products in time for certain races. Dkt. #64 at ¶ 52. This list, however, provides absolutely no details about whether Action actually experienced delays in getting inventory in time for a specific race.

In sum, Plaintiff has failed to plead facts showing that the alleged omissions were true. And Plaintiff has pleaded nothing to demonstrate that the alleged delays were both known to Defendants and intentionally or recklessly concealed by Defendants at the time they made the 4Q03 forecasts. *See In re Vantive Corp.*, 283 F.3d at 1085.

### c. Increased Shipping Costs.

Plaintiff argues that Defendants should have disclosed that Action would have to pay extra to ship products by air rather than by sea, but provides no specific allegations about the extent to which Defendants knew such shipping problems would occur or when they knew it. Moreover, the Complaint provides no particularized allegations that Action actually paid

- 8 -

extra for air shipping. Plaintiff's allegations seem to derive solely from Action's October 23, 2003 statement that freight costs impacted earnings. Given the 120 day lead time for products, a reasonable inference can be drawn that Defendants knew they might be forced to pay more for air shipping during 4Q03. But this is not enough. Plaintiff must plead particularized facts giving rise to a strong inference that Defendant acted intentionally or with deliberate recklessness in failing to disclose information about shipping costs. *See* 15 U.S.C. § 78u-4(b)(2).

### 2.     Four Alleged Misrepresentations.

The Complaint specifies four statements that were allegedly false or misleading: (1) Action's reference to its "conservative inventory management policies," (2) Action's statement that it was "careful not to produce die cast product in excess of demand," (3) Action's statements about the increase in track-side sales, and (4) Action's representation that it had a "strong business model." Dkt. #64 at ¶ 101.

#### a.     Inventory Management.

Defendants' statement that Action had "conservative inventory management policies" is, in the absence of specifically-pled and directly-relevant omissions, too general to be actionable. As concluded above, the Complaint's alleged omissions regarding inventory are not pled with the required level of particularity or facts that create a strong inference of scienter. And in addition to the absence of properly pled omissions that would render this general statement misleading, there is no discussion of what would constitute a "conservative inventory management policy" and how Action's inventory management policy differed from that model. *See, e.g.*, *In re Vantive Corp.*, 283 F.3d at 1087 ("The complaint also does not indicate what it means for a management team to be 'extremely strong,' what the 'continual' disagreements that supposedly 'plagued' the managerial team consisted of, or why such disagreements would make it misleading for the company to have characterized its management as being 'strong'").

- 9 -

### b. Production of Die Cast Products.

Defendants' statement that Action was "careful not to produce die cast product in excess of demand" is not actionable for two reasons. First, the Complaint does not state with particularity facts on which Plaintiff bases its belief that the statement was false or misleading. The only information Plaintiff provides about excess production of inventory is that Action would sometimes order a full production run of products "when team owners would request smaller orders from Wagenhals." Dkt. #64 at ¶ 74. Defendants' remarks about not producing die cast products in excess of demand, however, were made during a discussion of mass retailers and distributors, not team owners. Dkt. #64 at ¶ 97. While the Complaint states that Action "did produce several cars despite having received orders that were below the MOQ [minimum order quantity]," the Complaint provides no particularity regarding when Action placed those orders and whether they were made for retailers as opposed to team owners.

Second, the Complaint fails to plead specific facts concerning this alleged misrepresentation that give rise to a strong inference of scienter. Without providing any details, Plaintiff claims that ordering products in excess of demand was acknowledged by Melodie Volosin, an Action executive, as "a risk the company took." Dkt. #64 at ¶ 76. Plaintiff fails to allege when Volosin made her comment about inventory and whether she was discussing the retail market. Moreover, general allegations concerning "sales and inventory" reports, a "color-coded spreadsheet," and weekly "numbers meetings" (Dkt. #64 at ¶¶ 85-88) provide no basis for strongly inferring scienter, and allegations that Volosin, Wagenhals, or other officers received inventory figures "on a daily basis" (*id*. at ¶ 86) say nothing about when they knew of problems in the production or demand of die cast products. *See In re Vantive Corp.*, 283 F.3d at 1087-88 (finding complaint deficient for stating that officers received different kinds of "revenue reports" on a regular basis).

### c.  **Track-side Sales.**

Defendants stated during the July 23, 2003 conference call that "track-side sales have increased." Dkt. #64 at ¶ 99. Plaintiff contends that even if the statement were technically true, it was misleading because Action failed to disclose that "recent driver and sponsor changes, combined with the 120 day minimum lead time, guaranteed that items then in production would not be ready for timely track-side sales unless the company opted to pay substantially more for expedited shipping thus cutting into revenues." Dkt. #68 at 6.

This argument fails for several reasons. First, statements that simply report past performance generally may not be used by plaintiffs to show they were misled about future performance. *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512-13 (9th Cir. 1991) (addressing remarks about a company's past growth rate in a "fraud on the market" context). Second, the statement that track-side sales increased does not address what method Action would use to ship future track-side inventory – the allegedly misleading aspect of the statement. Third, the Court has already determined that the Complaint does not sufficiently plead facts relating to the omission of information about increased shipping costs – the basis for this misrepresentation claim. Finally, Action CFO David Martin made the statement in the context of the cautionary approach Action was taking in its 4Q03 forecasts, noting only that increased track-side sales was reason for optimism. Dkt. #64 at ¶ 99. The statement did not "affirmatively create an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

Further, the statements about track-side sales are not supported by facts that give rise to a strong inference of scienter. Plaintiff argues that Defendants owed a duty to disclose that the only way they could maintain the increases of track-side sales, given their 120-day lead time, would be to pay more for air shipping to get the products to the track sooner. Dkt. #68 at 6. This lead time might support a reasonable inference that Defendants knew, prior to making their 4Q03 forecasts, that at some point during the quarter they would be forced to ship products by air. But a reasonable inference of scienter is not enough under the PSLRA.

- 11 -

1  The Complaint does not allege specific facts indicating that Defendants knew the extent of
2  the shipping problems they would encounter during 4Q03, or when Defendants made the
3  decision to ship products by air rather than by sea.

### d.      Strong Business Model.

5  In a June 2, 2003 press release, Action stated that it "continues to benefit from a
6  strong balance sheet and a business model that gives us both liquidity and flexibility." Dkt.
7  #64 at ¶ 96. During the July 23, 2003 conference call, Martin referred to "the integrity of
8  [Action's] business model that serves [Action] so well," and stated "[w]e believe that we
9  have a business that will consistently generate income in cash and increase shareholder
10 value." Dkt. #64 at ¶ 99. Plaintiff argues that these statements were made misleading by the
11 omissions detailed above. Because the Complaint fails properly to plead the omissions, as
12 explained above, this misrepresentation claim also fails.

13 In addition, the statements about Action's business model are too vague to support
14 Plaintiff's claim. *See, e.g. Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1232, 1245 (N.D.Cal. 1998)
15 ("Vague statements of opinion are not actionable under the federal securities laws because
16 they are considered immaterial and discounted by the market as mere 'puffing'"); *Plevy v.
17 Haggarty*, 38 F.Supp.2d 816, 827 (C.D. Cal. 1998). "No matter how untrue a statement may
18 be, it is not actionable if it is not the type of statement that would significantly alter the total
19 mix of information available to investors." *Wenger*, 2 F.Supp.2d at 1245 (quotations
20 omitted). "Vague, amorphous statements are not actionable because reasonable investors do
21 not consider 'soft' statements or loose predictions important in making investment
22 decisions." *Id*. Such general statements about business models are seen in virtually every
23 public statement companies make. *See Plevy*, 38 F.Supp.2d at 827.

24 Additionally, Plaintiff pleads no facts showing that the statement was false – that
25 Action did not have a strong business model. The Complaint does not define what would
26 constitute a "strong business model" in the die cast collectible market and how Action's
27 business model was weak. *See, e.g.*, *In re Vantive Corp.*, 283 F.3d at 1087 (finding

- 12 -

complaint insufficient for failing to indicate what would constitute an "extremely strong" management team).[5]

In short, it appears Plaintiff has attempted to use Defendant's stated reasons for failing to meet 4Q03 earnings goals, outlined in the revised financial guidance Action issued after 4Q03 ended (Dkt. #64 at ¶ 107), as the basis for its entire Complaint. Such an attempt to prove "fraud by hindsight" does not satisfy the PSLRA. *In re Daou*, 411 F.3d at 1021.

**B.     Funline Acquisition.**

Plaintiff argues that Action's acquisition of Funline on September 23, 2003, was the motive for Defendants' misrepresentations and thus constitutes evidence of scienter. But the Complaint generally pleads that "the artificial inflation of Action Performance stock enabled defendants advantageously to fund their acquisition of Funline." Dkt. #64 at ¶ 112.

Courts have held, however, that stock-based acquisitions do not allow a strong inference of scienter. *See, e.g.*, *In re PETsMART Sec. Litig.*, 61 F.Supp.2d 982, 999 (D. Ariz. 1999). Moreover, the Funline acquisition was completed using less than 2% of Action's outstanding stock. Action would have only saved a fraction of that amount by inflating its stock price to complete the acquisition. What is more, Plaintiff pleads no information about the extent to which the allegedly inflated share price benefitted Action. *See In re Vantive Corp.*, 283 F.3d at 1097 (finding that complaint insufficiently pleaded motive inferred from a stock-based acquisition because the complaint lacked information on the total number of shares that would have been issued absent the misrepresentation, the total number of shares

---

[5]Plaintiff relies on *In re Infineon Techs. A.G. Sec. Litig.*, No. CV-04-4156, 2006 WL 1329887, at *6 (N.D.Cal. May 16, 2006), for the proposition that "[a] statement need not be detailed in order to trigger a disclosure duty." Dkt. #68 at 5. There, the court found that statements that competition was "intense" were misleading when in fact the defendant was engaged in price-fixing and had little or no competition at all. In the context of such plainly contradictory omissions, the defendant's general statement was clearly misleading. Plaintiff has pled no such plainly contradictory omissions in this case.

of the acquiring company, or what the defendants stood to gain by making misrepresentations).

Plaintiff also argues that the acquisition of Funline on September 23, 2003 "triggered a duty to disclose known problems emanating from the driver and sponsorship changes that Action was then experiencing." Dkt. #68 at 7; Dkt. #64 at ¶ 106; *see, e.g. McCormick*, 626 F.3d at 876. Essentially, Plaintiff is trying to take advantage of the "disclose or abstain" rule, which "make[s] it illegal in some circumstances for those possessing inside information about a company to trade in that company's securities unless they first disclose the information." *Brody*, 280 F.3d at 1000. The Ninth Circuit, however, has adopted the contemporaneous trading requirement for Section 10(b) and Rule 10(b)-5 actions that allege some form of insider trading with a duty to disclose. *See Neubronner v. Milken*, 6 F.3d 666, 669 (9th Cir. 1993). A plaintiff bringing this sort of insider trading claim must have traded in a company's stock at about the same time as the insider. *Brody*, 280 F.3d at 1001. Here, Plaintiff makes no allegation that it traded shares around the time of the acquisition of Funline and cites no complaints of anyone who exchanged shares or assets of Funline for Action stock. Plaintiff thus cannot avail itself of the protections of the "disclose or abstain" rule and cannot use Action's failure to disclose information in connection with its acquisition of Funline to support a claim for fraud on itself and alleged class members.

**C.     Section 20(a) Claim Against Wagenhals.**

Rule 20(a) of the Exchange Act provides for liability against:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

"To establish control person liability, a plaintiff must show that a primary violation, e.g., a Section 10(b) violation, was committed[.]" *Wenger*, 2 F.Supp.2d at 1252. Because

- 14 -

the Court will dismiss Plaintiff's Section 10(b) and Rule 10b-5 claims, the claim under Rule 20(a) must be dismissed as well.

**D. Leave to Amend.**

Because the Court cannot conclude that Plaintiff is unable to plead a claim, Plaintiff will be granted leave to amend its Complaint in accordance with the schedule set forth below.

**IT IS ORDERED:**

1. Defendant's Motion to Dismiss (Dkt. #65) is **granted**.
2. Plaintiff's Amended Complaint (Dkt. #64) is dismissed with leave to file a further amended complaint by March 12, 2007, submitting both clean and red-lined versions in compliance with Local Rule LRCiv 15.1.
3. Any motion by Defendants to dismiss a further amended complaint must be filed within 28 days of service of the amended complaint, any response within 14 days of service of the motion, and any reply within 7 days of service of the response.

DATED this 13th day of February, 2007.

David G. Campbell
United States District Judge

- 15 -